JOHN HYVONEN v. HECTOR IRON COMPANY.[1]

February 14, 1908.

No. 15,461—(199).

**Evidence—Res Gestæ.**

A skip, containing miners who were returning to work, was being low-
ered in a mining shaft by means of a cable operated by an engine, when
the skip suddenly dropped about sixty feet, injuring the men. *Held:*

1. The declaration by the engineer, within twenty five minutes after the
skip dropped, and within five minutes after the men were brought to the
surface, that he "got scared" and turned the brake the wrong way, was
admissible in evidence as a part of the res gestæ.

2. The provisions of sections 2180, 2181, R. L. 1905, with reference
to the classification, qualification, and licensing of engineers, are not self-
contradictory and unconstitutional.

3. It does not conclusively appear from the evidence that the second
breaking of respondent's leg (the result of a fall) was so remote from the
original accident as to constitute an independent injury, for which appel-
lant was not chargeable.

Action in the district court for St. Louis county to recover $15,234
damages for personal injuries. The case was tried before Dibell,
J., and a jury which returned a verdict in favor of plaintiff for $4,-
333.33. From an order denying its motion for judgment notwith-
standing the verdict or for a new trial, defendant appealed. Affirmed.

*E. C. Kennedy,* for appellant.

*John R. Heino, Theo. Hollister,* and *Wm. H. Lamson,* for respond-
ent.

LEWIS, J.

Appellant company was operating a mine in St. Louis county, and
respondent was employed as a miner in underground work. A skip
was operated in the shaft by means of a wire cable and a steam en-
gine situated in the engine house, about one hundred feet from the
top of the shaft. Respondent, with four others, got into the skip,
and the engineer started to lower them to the bottom of the shaft,
and when the skip had gone about twenty feet it stopped, and then

[1] Reported in 115 N. W. 167.

dropped to the bottom, causing serious injuries to respondent and others. The injured men were immediately taken to the surface in the skip, and respondent was carried to the engine house. Soon after arriving at the surface, two or three of the men proceeded toward the engine house, and the engineer came toward them, and one of them asked him how he let the skip go down in that manner, to which he replied: "At first, in opening the brake it commenced to go a little too fast, and then I turned it, and turned it—open entirely." Another witness testified that the engineer was asked: "How you let the skip down that way when four bells was rung?" In answer to which the engineer said that "he got kind of scared"; that it was going too fast, and he was going to brake it, and turned the brake the wrong way. These declarations were admitted in evidence over objections upon the ground that it was hearsay evidence, irrelevant, and immaterial, and no part of the res gestæ.

In the trial court's memorandum attention is called to the confusion of the authorities upon the subject of res gestæ, and the court observes that the declarations were made within twenty or twenty five minutes after the falling of the skip, and within five minutes from the time the men arrived at the surface, when the general result of the accident became known to the engineer; that he was on duty at that time; that the doctors had not yet arrived; that there was some excitement; that it was in the presence of the injured party, and at the place where the disputed act of negligence occurred. We think the case is fairly within the rule announced in O'Connor v. Chicago, M. & St. P. Ry. Co., 27 Minn. 166, 6 N. W. 481, 38 Am. 288. The declaration was so closely connected with the transaction that it was competent evidence in the nature of an admission, whether it be treated as a spontaneous exclamation (3 Wigmore, Ev. §§ 1745–1757), or whether it be considered as an admission by an agent while engaged in the course of his employment.

Statements of this character, by employees or agents intrusted with important duties with respect to machinery, or in the control of railway trains, have been received in evidence when made under such circumstances and at such a time as to indicate that they are entitled to credit. The rule has become so well settled with reference to this particular class of cases that no additional light can be thrown on

the subject by attempting to discuss it here, or to determine under what particular head or rule of evidence such declarations are admissible. The following citations are sufficient to indicate the position of the courts on the question. State v. Horan, 32 Minn. 394, 20 N. W. 905, 50 Am. 583; New York v. Rogers, 11 Colo. 6, 16 Pac. 719, 7 Am. St. 198; Hermes v. Chicago, 80 Wis. 590, 50 N. W. 584, 27 Am. St. 69; San Antonio v. Gray, 95 Tex. 424, 67 S. W. 763; Hooker v. Chicago, 76 Wis. 542, 44 N. W. 1085; Roberts v. Port Blakely, 30 Wash. 25, 70 Pac. 111; Union Pacific v. Edmondson (Neb.) 110 N. W. 650.

2. It was admitted at the trial that the engineer in charge of the engine house had no license, as provided by sections 2180 and 2181, R. L. 1905; but appellant objected to the evidence for the reason that the statute was in violation of the provisions of section 33, art. 4, of the state constitution, and in conflict with the provisions of section 2, art. 4, and section 1, art. 14, of the constitution of the United States.

Section 2181 divides engineers into four classes: Chief, first-class, second-class, and special engineers. In order to secure a license, a chief engineer must be twenty one years old, and be qualified to take charge of all classes of steam boilers, and have had five years' experience in operating such boilers. A first-class engineer is entitled to take out a license, and take charge of boilers of not more than three hundred horse power; second-class engineers are limited to one hundred horse power; and special engineers not to exceed thirty horse power boilers. The argument is that the statute requires that, before an engineer can take out a license for any class, he must qualify that he already had the number of years' experience required for that particular class. It is true that the word "such" is repeated in each subdivision referred to; but we have no difficulty in disposing of the objection. The terms of the statute are not necessarily contradictory. Section 2181, R. L. 1905, is a rewriting of a part of section 489, G. S. 1894. The authors of the revised laws introduced the word "such" in each section; but it is evident that the word refers merely in general terms to boilers and machinery, and not to the particular horse power applicable to each of the classes. The statute does not require the impossible, and its purpose is to per-

mit engineers of the lowest class gradually and by experience to advance to the next class, etc.

3. Respondent's leg was broken as a result of the accident, and he was confined to his bed for a period of about seven weeks before the cast was taken off. Several weeks afterwards he was able to walk out with the aid of crutches. He went to a boarding house for one night, and while walking, with the aid of his crutches, back to the hospital, slipped and fell, breaking his leg over again in the same place. Appellant objected to any evidence concerning this second break, for the reason that the injuries caused by it occurred at a subsequent time to the original injury, and was an entirely independent matter. The objection was not well taken. The jury were instructed, in arriving at the amount of damages, to take into consideration the pain and suffering which occurred as a direct result of the injury. The second break was in exactly the same place as the first, which indicated that it had not entirely healed, and that the second break was naturally caused by the imperfect condition resulting from the first. It was for the jury to say whether the second break was a direct result of the first.

It is unnecessary to discuss the other assignments.

Affirmed.