DiFazio, Appellant, *v. J. G. Brill Company et al.*

Argued October 19, 1938.

Before KELLER, P. J., CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Emanuel W. Beloff*, with him *J. J. Kilimnik*, for
appellant.

*Wayland H. Elsbree*, with him *White & Clapp*, for
appellees.

OPINION BY BALDRIGE, J., December 20, 1938:

In this workmen's compensation case the claimant
was employed by the J. G. Brill Company as a laborer.
On April 27, 1936, he and a fellow-workman were lift-
ing a wheelbarrow 2½ feet from the floor and dump-
ing steel chips or turnings therein into a box. When
thus engaged the claimant experienced a pain in his
back. His fellow-employee testified: "Q. Did you see
anything happen to Mr. DiFazio that day? A. Yes—

him and I were lifting the wheelbarrow and I judge maybe it was a hundred pounds or so in it and he had hold of one end and I had hold of the other and he had hold of the handle. When we lifted it to turn it over, he says it hurt his back. Q. As he turned the wheelbarrow, what did you do? A. Just set it down and I said to him—wait, I'm getting ahead of my story. His back was already sore and when we turned the barrow over, it gave him another jar and I said, 'You go to the dispensary,' and he said, 'No,' and I said, 'Why don't you go to his foreman and go to the dispensary,' and I believe he went to the dispensary but he didn't go to the foreman."

The hour in the morning the alleged accident occurred was not stated, but it does appear that the claimant continued at his work until after lunch time. His pain increasing, he reported to his boss who sent him to the dispensary where he received some pills from the nurse in charge and then went home. The nurse stated that DiFazio complained of a sore back and, when asked if he had hurt himself, said, "No." The next day he visited his employer's physician who concluded the man had lumbago and gave him more pills. After remaining home a week he reported for work but was obliged on account of his back to quit on May 9th, and he has not worked since.

On May 16, 1936, claimant entered the Temple University Hospital for treatment. He offered in evidence the hospital records, which set forth certain information received from him to the effect that about one month before he entered that institution (which would be a week before the alleged injury) he had a mild pain, particularly when he returned to an upright posture after bending over; that in 1930 he had pain similar to the present attack, except the duration was about one week only. The final diagnosis was "spondylolisthesis," or, in other words, a slipping of a vertebra.

Dr. Beloff, called by the claimant, examined him on

August 25, 1936. He testified, on direct examination, that the claimant had an abnormal curvature of the spine, later termed by him as "spondylolisthesis," which, in his opinion, was caused by an accident, and as a result thereof he was totally disabled. On cross-examination, however, the doctor said that he could not definitely state that claimant's condition was due to traumatic origin, "you can only suspect it."

Dr. Matchett, resident doctor of Temple University Hospital, in charge of Orthopedics, testified that he examined and treated the claimant when he was at the hospital and found that he had a peculiar gait, marked atrophy of both lower legs, and "equina cavus deformity" of both feet, but that his chief complaint was localized in the midline of his lower back, which led him to make the original diagnosis of lumbar sacral strain, but that that did not account for the condition of his lower legs and feet and the absence of knee jerks. Later he made a diagnosis of spondylolisthesis, to which he attributed the claimant's peculiar gait, which, under the evidence, had existed a considerable time before the alleged accident. A characteristic of this disease as it develops is a pressure on the nerves going to the legs causing a contracture of the heel cords. This witness was unable to state whether the spondylolisthesis was of recent origin or of some duration. He testified further, as follows: "Q. Doctor, after reading the report of the X-rays, would you still believe he had a lumbar sacral sprain? A. I would say it was highly possible he had a lumbar sacral sprain. Don't misinterpret this. You can have two conditions. It is obvious he had spondylolisthesis. He could have a lumbar sacral strain on top of it." When asked, if there had been a sudden onset of pain, how it could be accounted for, he answered: "I think on two bases. It could either be a further progress of the old established condition of spondylolisthesis which became acute, or it could be an injury superimposed on a weak

structure." It will be observed that Dr. Matchett did not definitely attribute the pain to either.

Dr. Merchant, who made several X-ray examinations of the claimant, testified that the fifth lumbar had slipped forward about a half inch, and that in his opinion this condition had been present probably for years, but he could not tell just how long; that there was nothing in the X-ray pictures indicating any recent bone changes.

There was further testimony offered by an officer of a beneficial association of which claimant was a member, who produced an application form made out by claimant for disability benefits, dated June 2, 1936. One of the questions therein was as follows: "If present illness or disability is due to accident, did accident happen in the course of your occupation?" and the answer written in by the claimant is "No."

The referee found that the claimant's disability was caused by spondylolisthesis, which was an old chronic condition from which he had been suffering for years and was in no way connected with, related to, or aggravated by, any accident at any time he was in the defendant's employ. The board set aside the referee's findings of fact and conclusions of law and substituted its own finding that claimant, on April 27, 1936, in the lifting and dumping of a wheelbarrow suffered a severe lumbo sacral strain and also aggravated the spondylolisthesis that totally incapacitated him. The court of common pleas, on appeal, sustained defendant's exceptions to the board's findings of fact and conclusions of law, holding that the evidence is insufficient to support a finding that claimant's disability is attributable to an accident happening in the course of his employment.

Under the issues presented, the appellant had the burden of showing, by sufficient competent evidence, an accident within the intendment of our statute, while in the course of his employment: *Swiderski v. Glen Alden Coal Co.*, 114 Pa. Superior Ct. 21, 28, 173 A.

865; *Smith v. State Workmen's Ins. Fund,* 128 Pa. Superior Ct. 133, 134, 193 A. 101. We are constrained to hold that the claimant has not successfully carried that burden.

A careful study and analysis of this evidence fails to establish by any competent evidence that the disability from which plaintiff suffers is due to an accidental origin. That he was afflicted with a spinal abnormality before the alleged accident is well established by the medical testimony, and that he had pain in his back prior thereto is borne out by the hospital record, which is supplemented by the testimony of claimant's fellow-employee. Disability, although overtaking one at work, is not compensable unless it is the result of an accident, some mishap, unexpected occurrence, something outside the usual course of an employee's duties. There is not the slightest suggestion that claimant tripped, slipped, fell, or was subjected to any violence, or did anything not fully intended and designed. He was doing his usual work, in a normal and ordinary manner.

Dr. Beloff's testimony, taken in its entirety, is not as definite and unequivocal as the law requires. Nor was the testimony of Dr. Matchett sufficient to support an award. It was only in his first diagnosis that he reached the definite conclusion that claimant had a lumbar sacral strain. After reading the X-rays, Dr. Matchett could only say "it was highly possible" that claimant had such an affliction, and he could not, or did not, definitely account for the sudden appearance of the pain. That leaves the claimant without sufficient medical testimony, which was essential in this case, to support an award. The testimony of an expert that it is "extremely possible and likely" that a pain or disease resulted from an injury is not equivalent to an assertion of a professional opinion that in fact it actually did so: *Anderson v. Baxter et al.,* 285 Pa. 443, 447, 132 A. 358. The expert must testify that "in his 'professional opinion the result in question did not come from the cause

582

alleged,' " if his testimony is to be entitled to any consideration. *McCrosson v. Philadelphia Rapid Transit Co.*, 283 Pa. 492, 496, 129 A. 568.

In *Procopio v. Susq. Collieries Co.*, 122 Pa. Superior Ct. 514, 186 A. 283, cited by appellant, the claimant slipped on a lump of coal and fell to the ground, wrenching his back. There, as in *Falls v. Tenn. Furn. Co. et al.*, 122 Pa. Superior Ct. 550, 186 A. 272; *Witt v. Witt's Food Market et al.*, 122 Pa. Superior Ct. 557, 186 A. 275, and in each of the other cases relied upon by appellant, the evidence clearly established an injury by an accident. They, with their dissimilar facts, do not rule the case in hand.

Judgment of the court below is affirmed.